# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

**FILED**
MAY 2 2 2008
5-22-08
NR

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

UNITED STATES OF AMERICA

v.

ABRAM PEREZ, a/k/a "Doughboy"

CRIMINAL COMPLAINT

**CASE NUMBER:**

## 08CR    413

MAGISTRATE JUDGE ASHMAN

I, James J. Ferguson, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief.

On or about November 12, 2007, at Carpentersville, in the Northern District of Illinois, the defendant,

**ABRAM PEREZ, a/k/a "Doughboy,"**

did knowingly and intentionally distribute and possess with intent to distribute a controlled substance, namely, a mixture and substance containing cocaine, a Schedule II Narcotic Drug Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1).

I further state that I am a Special Agent of the Federal Bureau of Investigation ("FBI") and that this complaint is based upon the following facts:

See Attached Affidavit.

Continued on the attached sheet and made a part hereof:   __X__ Yes    ____ No

_James J. Ferguson_
Signature of Complainant

Sworn to before me and subscribed in my presence,

May 22, 2008
Date

at  Chicago, Illinois
City and State

MARTIN C. ASHMAN
United States Magistrate Judge
Name & Title of Judicial Officer

Signature of Judicial Officer

STATE OF ILLINOIS )
                        )    **SS**
COUNTY OF COOK )

## A F F I D A V I T

I, James J. Ferguson, being duly sworn under oath, state as follows:

### My Background and Experience

1.      I have been employed by the Federal Bureau of Investigation ("FBI") as a Special Agent for approximately 12.5 years. I have participated in investigations involving drug trafficking activities for the past three years. As a Special Agent at the FBI, my primary duties consist of investigating criminal violations of the federal narcotics laws, including, but not limited to, Title 21, United States Code, Sections 841 and 846, and federal firearms laws including, but not limited to, Title 18, United States Code, Sections 922 and 924(c). I have received special training in the enforcement of laws concerning controlled substances and gang activity. I have also been involved in various types of electronic surveillance, in the debriefing of defendants, witnesses, and informants, as well as others who have knowledge of the distribution of controlled substances.

### Sources of Information for Affidavit

2.      The following information is based upon (a) my personal observations and knowledge, (b) my participation in this investigation, (c) information that I have received from other federal law enforcement officers, (d) information that I have received from officers with the Carpentersville Police Department ("CPD"), (e) my experience and training; (f) the training and experience of other law enforcement officers; (g) information provided to law enforcement officers by a cooperating witness ("CW"); (h) consensually recorded conversations; and (i) criminal history records maintained by the CPD, the Illinois

Department of Corrections ("IDOC") and the National Criminal Information Center ("NCIC"). To the extent that recorded conversations are summarized below, those summaries do not include references to all of the topics covered during the course of the conversation that was recorded. In addition, the summaries do not include references to all statements made by the speakers on the topics that are described.

Summary of Probable Cause Basis for Criminal Complaint

4.     This Affidavit is made for the limited purpose of establishing probable cause to support a criminal complaint charging ABRAM PEREZ, a/k/a "Doughboy" ("PEREZ"), with the offense of knowingly and intentionally distributing and possessing with intent to distribute a controlled substance, namely, a mixture and substance containing cocaine, in violation of 21 U.S.C. § 841(a)(1).

5.     In particular, as further set forth below, a confidential witness ("CW") working with the FBI successfully completed the controlled purchase of cocaine from PEREZ at his residence in Carpentersville, Illinois, on six separate days between June 26, 2007, and November 12, 2007. In addition, the CW has observed PEREZ, a prohibited person, in possession of two separate firearms at the subject premises.

6.     Based upon the information set forth below, there is probable cause to believe PEREZ has violated Title 21, United States Code, Section 841(a)(1). As this Affidavit is for the limited purpose of establishing probable cause to support the foregoing criminal complaint, it contains only a summary of relevant facts. I have not included each and every fact known to me concerning the individuals and events described in this Affidavit.

Facts Establishing Probable Cause

7.    The FBI and CPD, along with other law enforcement agencies are engaged in an on-going investigation of the faction of the Latin Kings street gang operating in Carpentersville, Illinois, which faction is commonly known as the "Carpentersville Latin Kings" or the "C-Ville Latin Kings." I have personally participated in the investigation since approximately January 2005. Information obtained from CPD files and during the course of the investigation has identified PEREZ, who goes by the street name "Doughboy," as a member of, and possible current leader (or "Inca") of the C-Ville Latin Kings. Based upon my personal participation in this investigation, I am familiar with all aspects of this investigation.

8.    In October 2006, the FBI approached the CW, who at that time was a member of the C-Ville Latin Kings, and interviewed him concerning, among other things, the CW's involvement with the drug trafficking activities of the C-Ville Latin Kings and the current structure of the C-Ville Latin Kings. The CW agreed to cooperate with law enforcement officers in their investigation of the C-Ville Latin Kings. Around that time, the CW informed the FBI that PEREZ was a member of the C-Ville Latin Kings who had sold drugs in the past.

9.    Since that first interview with the CW in October 2006, the CW has been charged in federal district court with federal drug offenses, including conspiracy to distribute and possess with intent to distribute marijuana and more than five kilograms of mixtures containing cocaine, in violation of Title 21, United States Code, Section 846. That case is pending.

-3-

10.     After being charged in the federal criminal complaint, the CW agreed to continue cooperating with law enforcement in its on-going investigation of the C-Ville Latin Kings. In subsequent debriefings, the CW stated that PEREZ was rumored to be situating himself to take over the leadership of the C-Ville Latin Kings. The CW identified PEREZ' residence to be a house located at 1863 Cambridge Drive, Carpentersville, Illinois. The CW indicated that PEREZ lived at the residence with other family members. The CW also stated that he believed he could purchase cocaine and firearms from PEREZ.

11.     Much of the information given to officers by the CW has been independently corroborated and I believe the CW to be credible. The CW has prior arrests for various offenses, including traffic violations, battery, domestic battery, violating an order of protection, illegal possession of a firearm, theft, possession of controlled substances and possession of drug paraphernalia. In 2006, the CW was convicted in State court for the manufacturing or delivery of 30-500 grams of cannabis and was sentenced to two years' probation. The CW has not been paid by the FBI and is cooperating in the investigation with the expectation that he will receive a benefit (*e.g.*, a lower sentence) on the pending federal criminal prosecution. The government has informed defendant that his cooperation may lead to a benefit in the CW's pending case but the government has not promised the CW any particular benefit.

12.     PEREZ has a substantial criminal history that includes convictions for various misdemeanor and felony offenses involving drugs and violence. In particular, a review of criminal history records for PEREZ shows that PEREZ has the following prior convictions:

(A)     On or about July 27, 2001, PEREZ was convicted in the Circuit Court of Kane County (01 CF 1447) of mob action and sentenced to 18

-4-

months' imprisonment in IDOC;

(B)    On or about July 27, 2001, PEREZ was convicted in the Circuit Court of Kane County (01 CF 1453) of mob action and sentenced to 18 months' imprisonment in IDOC;

(C)    On or about January 2, 2002, PEREZ was convicted in the Circuit Court of Kane County (01 CF 2947) of aggravated battery with a weapon and sentenced to 24 months' imprisonment in IDOC;

(D)    On or about March 8, 2007, PEREZ was convicted in the Circuit Court of Kane County (04 CM 6797) of possession of drug paraphernalia and sentenced to 36 days' imprisonment;

(E)    On or about March 12, 2007, PEREZ was convicted in the Circuit Court of Kane County (05 CF 630) of aggravated discharge of a firearm and sentenced to 48 months' imprisonment in IDOC; and

(F)    On May 16, 2007, PEREZ was convicted in the Circuit Court of Lake County (07 CM 1386) of violating an order of protection and sentenced to one year supervision.

A.    Controlled Purchase of Cocaine on June 26, 2007

13.    On June 26, 2007, under the direction and control of law enforcement officers, the CW successfully completed the controlled purchase of cocaine from PEREZ at his residence located at 1863 Cambridge Drive, Carpentersville, Illinois. The controlled drug purchase was facilitated through several telephone conversations between the CW and PEREZ that were consensually recorded.

14.    In particular, during the early evening of June 26, 2007, the CW placed a consensually monitored and recorded phone call to PEREZ. A male answered the call. The CW later identified the male answering the phone to be PEREZ. During the call, CW asked PEREZ whether PEREZ could sell one-eighth of an ounce of cocaine by asking: "Can you do me a B? A ball." I know from my training and experience that one-eighth of an ounce of powder cocaine is commonly referred to as an "eight-ball," a "ball" or a "B." An eight-ball of cocaine weighs approximately 3.5 grams. I know based upon my discussions with the CW that the CW was referring to an eight-ball of cocaine. PEREZ, without asking for clarification, replied, "Yeah, let me get back to you on that, um, cause I'm not around the shit. That cool?" The CW acknowledged and asked, "How much?" PEREZ responded by saying "110," which the CW understood to mean that PEREZ would sell the eight-ball of cocaine to the CW for $110.

15.    Later on the evening of June 26, 2007, the CW and PEREZ engaged in another consensually monitored and recorded phone call. In that call, PEREZ informed the CW that PEREZ was "still waiting on dude and shit," which the CW understood as a statement by PEREZ that PEREZ was still waiting for his cocaine source to re-supply him with cocaine. Later, the CW asked, "Well, what, what you got right now? You got anything?" PEREZ answered, "Man, I ain't got shit, but I got a G ball," which the CW understood as meaning that PEREZ could sell to the CW one gram (a "G") of cocaine. The CW said, "I'll take that then," meaning that the CW wanted to buy the gram of cocaine from PEREZ. PEREZ then told the CW to "come through," which the CW understood as an instruction for the CW to travel to PEREZ' residence at 1863 Cambridge Drive, Carpentersville, Illinois, in order to conclude the purchase of the cocaine. PEREZ and the

CW ended the call with the Latin King salutation of "Crown."

16.    Later on the evening of June 26, 2007, the CW traveled to PEREZ' residence at 1863 Cambridge Drive, Carpentersville, Illinois, in order to purchase the gram of cocaine from PEREZ. Prior to meeting with PEREZ, the CW's person was searched for drugs and other contraband with negative results. Agents gave the CW $160 in United States Currency with which to buy the cocaine from PEREZ. Agents gave the CW more money than was needed for a gram of cocaine in case PEREZ had more cocaine available to sell. An undercover officer posing as a friend of the CW's, drove the CW to the subject premises in a covert law enforcement vehicle that did not have drugs or contraband inside of it. Upon arriving at the subject premises, the CW left the undercover vehicle and walked to the attached garage of the residence. The undercover officer remained in the car, which was parked further down the street from the subject premises. The CW met PEREZ in the garage. The meeting between PEREZ and the CW was consensually recorded with video and audio recording devices on the CW's person. I have reviewed the audio and video recorded portions of the meeting between the CW and PEREZ.

17.    As captured on the audio recording of the meeting, when the CW first arrived and met PEREZ in the garage, the CW confirmed the cost of the gram of cocaine to be $40 by asking, "How much? Forty?" PEREZ responded, "Yeah." In a later debriefing about the incident, the CW stated that, at that time, PEREZ handed to the CW a plastic baggie containing a small amount of white powder. Due to the angle of the video recorder, the exchange was not captured on the video, although PEREZ is seen in a portion of video during the conversation. In exchange, the CW gave the $40 in buy money to PEREZ.

-7-

18.    During that same meeting with PEREZ in the garage, the CW asked PEREZ if he had any ammunition ("shells"). PEREZ told the CW that he had a "dukey duke" that used "short" rounds. Based upon information obtained from other officers, I understand that the term "dukey duke" is a reference to a .22 caliber weapon that fires "short" length .22 caliber rounds. PEREZ then sent his sister into the residence to retrieve a .22 caliber handgun. PEREZ' sister then returned with the gun. According to the CW, PEREZ then displayed the gun and racked the slide on the gun.[1] Due to the angle of the video camera lens, which was inadvertently canted upward, the handgun was not captured on the video recording. However, the audiotape of the meeting includes the distinct sound of the racking of the slide on a handgun. The CW later stated that he saw one round of ammunition in the firing chamber and, in addition, PEREZ handed the weapon and a loaded magazine to the CW. The CW observed that the magazine was loaded with hollow point ammunition. The CW observed the weapon to be a Smith and Wesson, Model P22 handgun. The CW observed the ammunition to be short .22 caliber cartridges.

19.    According to the CW during a later debriefing, the CW dropped the .22 caliber firearm while in PEREZ' garage, but the weapon did not discharge. The audio recording of the meeting includes a portion that is consistent with the sound of a gun hitting the hard floor of a garage. The video recording is also consistent with the CW bending down to pick up an object shortly after an object is heard striking the floor.

---

[1] During a recorded meeting with the CW on June 22, 2007, PEREZ told the CW that PEREZ would not return to IDOC ("I'm not goin' back") and that he was willing to die before that happened ("I'm ready to be one dead motherfucker (unintelligible)").

20.     During their conversation, PEREZ asked the CW, "You got shell casings for a gauge?"  Based upon my experience and training, I understand the term "gauge" to be a reference to a shotgun because shotguns are characterized by the size (or "gauge") of the shotgun barrel.   The CW asked, "What kind?"   PEREZ responded, "It's a twelve gauge."  In regards to the shotgun, PEREZ stated, "I keep the gauge in the garage."  The CW then asked PEREZ if the barrel of PEREZ' shotgun had been sawed off ("Is it cut?"). PEREZ responded, "Yeah, it's cut off."  The CW understood PEREZ to mean that the shotgun possessed by PEREZ had a sawed off barrel.  Also, PEREZ expressed his desire to obtain a "revolver . . . so I could kill a motherfucker."

21.     After the meeting with PEREZ, the CW left the subject premises and rejoined the undercover officer in the law enforcement vehicle.   As observed by the undercover officer, the CW placed the small baggie of suspect cocaine inside a console of the government vehicle. They then drove to a predetermined meeting location. At the meeting location, the CW was searched and  was found to be in possession of the remaining $120 of buy money that had been tendered to the CW previously.   The suspect cocaine was entered into evidence.  In addition, the audio and video recording devices were retrieved from the CW.  The CW was then debriefed about his meeting with PEREZ.

22.     Subsequent laboratory analysis by the Drug Enforcement Administration ("DEA") of the white powder demonstrated that it consisted of 0.56 grams of a mixture containing cocaine.

B.     Controlled Purchase of Cocaine of July 14, 2007

23.     On July 14, 2007, under the direction and control of law enforcement officers, the CW successfully completed the controlled purchase of cocaine from PEREZ.  The

-9-

controlled drug purchase was facilitated through phone calls between the CW and PEREZ.

24.    In particular, on the afternoon of July 14, 2007, the CW placed a consensually monitored and recorded phone call to PEREZ. During the call, the CW asked PEREZ, "Ya' think you can do that for me?" PEREZ responded by saying, "Yeah" but that he also wanted the CW to call him later. PEREZ asked, "What do you need? A "B"? The CW understood PEREZ' reference to a "B" as a reference to an eight-ball of cocaine. The CW stated, "Yeah." PEREZ replied, "Yeah, alright, that's straight," which the CW understood as meaning that PEREZ could sell the cocaine to the CW. The CW then suggested that the CW was "on my way" and that the CW was trying to arrange a ride to PEREZ' house.

25.    Later on the afternoon of July 14, 2007, the CW traveled to PEREZ' residence at 1863 Cambridge Drive, Carpentersville, Illinois, in order to purchase an eight-ball of cocaine from PEREZ. Prior to meeting with PEREZ, the CW's person was searched for drugs and other contraband with negative results. Agents gave the CW $120 in United States Currency with which to buy the cocaine from PEREZ. An undercover officer posing as a friend of the CW's, drove the CW to the subject premises in a covert law enforcement vehicle that did not have drugs or contraband inside of it. Upon arriving at the subject premises, the CW left the undercover vehicle and walked up to the residence.

26.    The CW met with PEREZ inside the subject premises. The meeting between PEREZ and the CW was consensually recorded with video and audio recording devices on the CW's person. I have reviewed the audio and video recorded portions of the meeting between the CW and PEREZ.

-10-

27.     As captured on the audio recording of the meeting, when the CW first arrived and met PEREZ, the CW complained about the weight of the cocaine from the first buy as being only .69 grams ("weighed like a point seven"). PEREZ asked, "What's you pick up last time?" The CW responded by saying "a 'G'" and that "it was short." PEREZ asked who was "complaining" before he claimed that, "I didn't weigh that shit out. My sister weighed that shit out." The CW then counted out $110 and gave it to PEREZ and, in exchange, PEREZ gave to the CW a small plastic baggie of cocaine. The CW held up the baggie, which can briefly be seen in the video recording.

28.     After the meeting with PEREZ, the CW left the subject premises and rejoined the undercover officer in the law enforcement vehicle. The CW thereafter provided the small baggie of suspect cocaine to the undercover officer. At the meeting location, the CW was searched and was found to be in possession of the remaining $10 of buy money that had been tendered to the CW previously. The suspect cocaine was entered into evidence. In addition, the audio and video recording devices were retrieved from the CW. The CW was then debriefed about his meeting with PEREZ.

29.     Subsequent laboratory analysis by the DEA of the white powder demonstrated that it consisted of 3.4 grams of a mixture containing cocaine.

C.      Controlled Purchase of Cocaine on July 20, 2007

30.     On July 20, 2007, under the direction and control of law enforcement officers, the CW successfully completed the controlled purchase of cocaine from PEREZ. The controlled drug purchase was facilitated through phone calls between the CW and PEREZ. PEREZ agreed to sell to the CW two grams of cocaine.

31.   In particular, on the afternoon of July 20, 2007, the CW placed a consensually monitored and recorded phone call to PEREZ. During the call, the CW told PEREZ that the CW was going to go to PEREZ' residence. PEREZ agreed.

32.   Later on the afternoon of July 20, 2007, the CW traveled to PEREZ' residence at 1863 Cambridge Drive, Carpentersville, Illinois, in order to purchase an eight-ball of cocaine from PEREZ. Prior to meeting with PEREZ, the CW's person was searched for drugs and other contraband with negative results. Agents gave the CW $90 in United States Currency with which to buy cocaine from PEREZ. An undercover officer then drove the CW to the subject premises in a covert law enforcement vehicle that did not have drugs or contraband inside of it. Upon arriving at the subject premises, the CW left the undercover vehicle and walked up to the residence.

33.   The CW met with PEREZ inside the residence. The meeting between PEREZ and the CW was consensually recorded with an audio recording device on the CW's person. I have reviewed the audio recording of the meeting between the CW and PEREZ. Inside the residence, PEREZ gave to the CW two small plastic baggies of suspect cocaine and, in exchange, the CW gave to PEREZ $70 in buy money.

34.   After the meeting with PEREZ, the CW left the subject premises and rejoined the undercover officer in the law enforcement vehicle. The CW thereafter provided the two small baggies of suspect cocaine to the undercover officer. At the meeting location, the CW was searched and was found to be in possession of the remaining $20 of buy money that had been tendered to the CW previously. The suspect cocaine was entered into evidence. In addition, the audio recording device was retrieved from the CW. The CW was then debriefed about his meeting with PEREZ.

35.    Subsequent laboratory analysis by the DEA of the white powder demonstrated that, in total, it consisted of 1.6 grams of a mixture containing cocaine.

D.    PEREZ Possesses a Gun During a Meeting on August 9, 2007

36.    On August 9, 2007, the CW met with PEREZ at PEREZ' residence at1863 Cambridge Drive, Carpentersville, Illinois.  This meeting was consensually recorded with audio, but not with video. I have reviewed the audio recording and debriefed the CW about the meeting with PEREZ.  While meeting on the front porch of the residence, the CW and PEREZ observed rival gang members come out of a residence across the street from PEREZ' residence.  PEREZ had his little brother, who is approximately 13 years of age, bring PEREZ what the CW observed as being a small .22 caliber handgun.  PEREZ pointed the gun at the rival gang members.  The CW observed that this .22 caliber handgun was not the same handgun displayed by PEREZ to the CW on June 26, 2007. The CW noted that this handgun was smaller in size than the one previously displayed.

37.    On the audio recording, PEREZ is heard calling for his brother, telling him to bring the "little bitty bitch."  The CW advised that PEREZ refers to handguns as "bitch." On the audio recording, PEREZ is further heard making the sound "pow pow . . . got something for that little faggot ass bitch" while referring to a rival gang member across the street.  The CW then asked PEREZ if PEREZ was concerned about being seen on the porch by the rival gang members.  PEREZ responded, "That's why I put this strap on, nigga.  Point it at his ass."  Further, the CW is heard confirming the type of gun to be a .22 caliber gun (a "dukey duke").  During this meeting, the CW also observed that the front door to PEREZ' residence is secured by deadbolt locks that go into the door frame.  The bolts are spaced out at the top, middle and bottom of the door.

-13-

38.    I know from my experience and training that persons illegally possessing drugs or guns in their residence often use reinforced (e.g., heavily bolted) doors as both (a) a deterrent to being robbed of drugs, drug proceeds, guns or other property, and (b) a barrier designed to slow the entry of law enforcement officers into the premises so that drugs, weapons and other contraband can be destroyed, disposed of or concealed prior to the entry of law enforcement officers into the premises.

E.    Controlled Purchase of Cocaine on October 25, 2007

39.    On October 25, 2007, under the direction and control of law enforcement officers, the CW successfully completed another controlled purchase of cocaine from PEREZ at 1863 Cambridge Drive, Carpentersville, Illinois. The controlled drug purchase was facilitated through a phone call between the CW and PEREZ. PEREZ agreed to sell to the CW two eight-balls of cocaine for $220 (or $110 for each eight-ball of cocaine).

40.    On the afternoon of October 25, 2007, the CW, under law enforcement surveillance traveled to PEREZ' residence at 1863 Cambridge Drive, Carpentersville, Illinois, in order to purchase the two eight-balls of cocaine from PEREZ. Prior to meeting with PEREZ, the CW's person and his vehicle were searched for drugs and other contraband with negative results. Agents gave the CW $500 in United States Currency with which to buy the cocaine from PEREZ. The CW was then placed under visual surveillance during his drive to PEREZ' residence. The CW did not stop along the way to PEREZ' residence. The CW parked his car and then entered the residence through the front door. The meeting between PEREZ and the CW was consensually recorded with video and audio recording devices on the CW's person. I have reviewed the audio and video recorded portions of the meeting between the CW and PEREZ.

-14-

41.     Inside the house, the CW asked PEREZ whether PEREZ could sell to the CW one or two eight-balls of cocaine ("One ball, two balls?"). PEREZ agreed to sell to the CW two "balls," meaning two eight-balls of cocaine. The CW then asked, "How much?" A clear response is not audible on the recording, but the CW is then heard counting, "twenty, forty, sixty, eighty, a hundred, twenty, forty, sixty, eighty, (unintelligible) hundred, twenty" as he counted out $220 in purchase money for the two eight-balls of cocaine. In a later debriefing, the CW stated that the CW gave $220 in buy money to PEREZ. PEREZ then walked outside the residence and looked up and down the street. PEREZ returned to the residence and spoke with his sister. PEREZ then went upstairs and returned with a clear plastic baggie containing a white powder that the CW believed to be cocaine. PEREZ then came up behind the CW, who was seated on a couch. PEREZ dropped the baggie of cocaine between the CW and an infant sitting next to the CW. At the time, PEREZ was talking on the telephone with unknown individual. The video recording captured the CW holding the plastic baggie of cocaine after PEREZ delivered it to the CW. The CW then asked PEREZ if there were two eight-balls of cocaine in the baggie ("Two in there?").

42.     After the meeting with PEREZ, the CW left the residence, entered his car and departed from the area. Starting approximately one-half block from the residence, the CW was placed under visual surveillance by law enforcement officers to a predetermined meeting location.[2]  At the meeting location, the CW and his car were again searched for

_____

[2] Agents in charge of the investigation elected to maintain surveillance at a greater distance from the residence because PEREZ had previously made statements to the effect that PEREZ was concerned that law enforcement had PEREZ' residence under surveillance.

contraband and other items. The CW was found to be in possession of the plastic baggie of suspect cocaine and to not be in possession of $220 of the buy money that had been tendered to the CW previously. The CW did possess the remaining $280 of the buy money previously tendered to him. The suspect cocaine was entered into evidence. In addition, the audio and video recording devices were retrieved from the CW. The CW was then debriefed about his meeting with PEREZ.

43.     Subsequent laboratory analysis by the DEA of the white powder demonstrated that it consisted of 6.6 grams of a mixture containing cocaine.

F.     Controlled Purchase of Cocaine on November 8, 2007

44.     On November 8, 2007, under the direction and control of law enforcement officers, the CW successfully completed another controlled purchase of cocaine from PEREZ at 1863 Cambridge Drive, Carpentersville, Illinois. The controlled drug purchase was facilitated through phone calls between the CW and PEREZ. PEREZ agreed to sell to the CW another two eight-balls of cocaine for $210.

45.     On the afternoon of November 8, 2007, the CW, under law enforcement surveillance traveled to PEREZ' residence at 1863 Cambridge Drive, Carpentersville, Illinois, in order to purchase the two eight-balls of cocaine from PEREZ. Prior to meeting with PEREZ, the CW's person and his vehicle were searched for drugs and other contraband with negative results. Agents gave the CW $230 in United States Currency with which to buy the cocaine from PEREZ. The CW was then placed under visual surveillance during his drive to PEREZ' residence. The CW did not stop along the way to PEREZ' residence. The CW parked his car and then entered the residence through the front door.

46.    The CW met with PEREZ inside the residence.  The meeting between PEREZ and the CW was consensually recorded with a video and audio recording device on the CW's person.  I have reviewed the recording of the meeting between the CW and PEREZ.  Inside the residence, PEREZ retrieved a baggie of white powder from what appeared on the video recording to be a vase and gave it to the CW.  In exchange, the CW gave to PEREZ $210 in buy money.

47.    After the meeting with PEREZ, the CW left the residence, entered his car and departed from the area.  Starting approximately one-half block from the residence, the CW was placed under visual surveillance by law enforcement officers to a predetermined meeting location.  The CW and his car were again searched for contraband and other items. The CW was found to be in possession of the plastic baggie of suspect cocaine and to not be in possession of $210 of the buy money that had been tendered to the CW previously.  The CW did possess $20 of the buy money previously tendered to him.  The suspect cocaine was entered into evidence.  In addition, the audio and video recording device was retrieved from the CW.  The CW was then debriefed about his meeting with PEREZ.

48.    Subsequent laboratory analysis by the DEA of the white powder demonstrated that it consisted of 6.7 grams of a mixture containing cocaine.

G.    Controlled Purchase of Cocaine on November 12, 2007

49.    On November 12, 2007, under the direction and control of law enforcement officers, the CW successfully completed another controlled purchase of cocaine from PEREZ at 1863 Cambridge Drive, Carpentersville, Illinois.  The controlled drug purchase was facilitated through phone calls between the CW and  PEREZ.  PEREZ agreed to sell

-17-

to the CW one-half ounce of cocaine and an additional eight-ball of cocaine, which is equivalent to five total eight-balls of cocaine. PEREZ agreed to sell the cocaine to the CW for $530 (or $110 for the eight-ball of cocaine and $420 for the one-half ounce of cocaine).

50.     On the afternoon of November 12, 2007, the CW, under law enforcement surveillance traveled to PEREZ' residence at 1863 Cambridge Drive, Carpentersville, Illinois, in order to purchase the cocaine from PEREZ. Prior to meeting with PEREZ, the CW's person and his vehicle were searched for drugs and other contraband with negative results. Agents gave the CW $1,000 in United States Currency with which to buy the cocaine from PEREZ. The CW was then placed under visual surveillance during his drive to PEREZ' residence. The CW did not stop along the way to PEREZ' residence. The CW parked his car and then entered the residence through the front door.

51.     The CW met with PEREZ. The meeting between PEREZ and the CW was consensually recorded with a video and audio recording device on the CW's person. I have reviewed the audio and video recording from the meeting and I have also debriefed the CW about the buy. The CW initially met with PEREZ inside the residence. After talking for a period of time, they left the house and continued talking in the driveway of the residence. They then returned to the inside of the house to complete the drug deal.

52.     Upon entering the house, PEREZ appeared to lock the front door (other individuals believed to be PEREZ' family members and/or friends of his family members were near the front door of the residence). PEREZ then went to a different part of the house and came back to sit at a table in the living room area of the residence. The CW sat down with PEREZ at the living room table. The video camera on the CW's person was directed horizontally and PEREZ can be seen clearly sitting at the table. During the

-18-

conversation between the CW and PEREZ at the table, the CW asked, "How much for a half?," in response to which PEREZ stated, "420." The CW then proceeded to count out $400 in front of PEREZ. After doing so, the CW stated, "And how much for . . . buck, buck ten for a ball"? In doing so, the CW was confirming that the price for an eight-ball of cocaine ("a ball") would be $110 (a "buck ten"). PEREZ did not respond. As the total price for the cocaine was $530 and the CW did not have $10 bills to make the purchase, the CW also asked, "You got 10?" and PEREZ responded affirmatively by saying, "Mm hm." While seated at the table, PEREZ produced a plastic bag of white powder and, using what appeared to be a kitchen knife, removed powder from the plastic bag and placed it into a smaller bag, which he placed on a small scale. After adjusting the volume of white powder in the bag, PEREZ gave the bag to the CW. PEREZ then proceeded to repeat the procedure using a second plastic bag. After weighing the second plastic bag with the white powder, PEREZ gave that second bag to the CW. The total weight of cocaine the CW expected to receive from PEREZ (assuming PEREZ' honesty in weighing the drugs) would be 17.6 grams.[3] During the conversation, the CW gave $540 to PEREZ and PEREZ gave $10 to the CW.

53.    Later in the conversation, PEREZ and the CW spoke about the possibility of PEREZ getting arrested. PEREZ stated, "The only way a motherfucker can fuck me over, bro, is when they snitch on me. When they gonna come raid my crib . . . find nothin'." The CW understood PEREZ to mean that PEREZ' unlawful drug trafficking and gun possession would not be detected by law enforcement unless somebody informed law enforcement

---

[3] One-half ounce is equivalent to approximately 14.1 grams and one-eighth ounce is equivalent to approximately 3.5 grams.

about PEREZ' illegal activities ("snitched") and that, to avoid being caught in possession of contraband, PEREZ generally did not keep contraband at the residence. Further, PEREZ indicated to the CW that he had three gang members ready to retaliate against anybody who "snitched" on PEREZ: "I got three niggas, you know what I'm sayin'. I have three niggas waiting to go on this shit."

54.     After the meeting with PEREZ, the CW left the residence, entered his car and departed from the area. Starting approximately one-half block from the residence, the CW was placed under visual surveillance by law enforcement officers to a predetermined meeting location. At that location, the CW and his car were again searched for contraband and other items. The CW was found to be in possession of the two plastic baggies of suspect cocaine and to not be in possession of $530 of the buy money that had been tendered to the CW previously. The CW did possess $470 of the buy money previously tendered to him. The suspect cocaine was entered into evidence. In addition, the audio and video recording device was retrieved from the CW. The CW was then debriefed about his meeting with PEREZ.

55.     Subsequent laboratory analysis by the DEA of the white powder demonstrated that, in total, it consisted of 16.6 grams of a mixture containing cocaine.

## Conclusion

WHEREFORE, Affiant submits that the foregoing evidence establishes that defendant ABRAM PEREZ, a/k/a "Doughboy," violated Title 21, United States Code, Section 841(a)(1), as charged in the foregoing Criminal Complaint.


_____
JAMES J. FERGUSON, Special Agent
Federal Bureau of Investigation
United States Department of Justice


SUBSCRIBED AND SWORN TO BEFORE ME
this 22nd Day of May, 2008.


_____
MARTIN C. ASHMAN
United States Magistrate Judge

-21-